**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GERALD DINGEE and MICHAEL LAMP Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WAYFAIR INC., NIRAJ SHAH, and MICHAEL FLEISHER,<br><br>Defendants. | No. 1:15-cv-6941 (TPG)<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Gerald Dingee and named plaintiff Michael Lamp (collectively, "Plaintiffs") by and through their undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Wayfair Inc. ("Wayfair" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases, conference calls, and media reports issued by and disseminated by Wayfair; (c) a review of other publicly

available information concerning Wayfair; (d) a review of public statements by Overstock.com, Inc. ("Overstock"); and (e) interviews with witnesses. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Wayfair securities between October 2, 2014 and August 31, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities law and to pursue remedies under asserting claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2. Wayfair is focused on selling furniture and home goods online. Unlike technology or high growth companies like Amazon, valuations for online companies selling home goods and furniture have traditionally been modest.

3. For over a decade, Wayfair's primary competitor Overstock, has been selling furniture and home goods online using a similar "inventory light" business model where furniture suppliers ship directly to the company's customers.

4. Overstock, which unlike Wayfair turns a profit, maintained a stock price to sales ratio of in the 0.1 to 0.3 range immediately preceding and during the Class Period.

5. Against this backdrop, in October 2014 Wayfair conducted its initial public offering October of 2014. Wayfair filed its Registration Statement on Form S-1/A with the SEC on September 19, 2014 and the Registration Statement was declared effective by the SEC on October 1, 2014 (the "IPO"). The final Prospectus was filed with the SEC on October 2, 2014.

The Registration Statement and Prospectus are collectively referred to herein as the "Registration Statement."

6. The Registration Statement was materially misleading because it failed to disclose Overstock as a competitor to Wayfair.

7. Defendants were motivated to omit Overstock as competitor and to distance itself from any comparisons to Overstock to command a higher valuation. This enabled Wayfair to price its IPO at $29/share—a rich valuation and several times larger than what it would have been had Wayfair been valued closer to Overstock and not its "competitors" Amazon and eBay. Wayfair raised $319 million in the IPO.

8. Throughout the Class Period, Defendants likewise failed to disclose Overstock as a competitor, rendering of each of the Company's periodic reports filed with the SEC materially misleading. At the same time, Wayfair insiders sold over 1.2 million shares of Wayfair stock at artificially inflated prices, reaping over $40.7 million in proceeds.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)) as Defendants maintain an office in this district and a significant portion of Defendants' actions and the subsequent damages took place within this District.

11. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

12. Lead Plaintiff Gerald Dingee ("Dingee") purchased Wayfair securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein. Lead Plaintiff's PSLRA certification was previously filed with the Court and is incorporated by reference.

13. Named Plaintiff Michael Lamp ("Lamp"), as set forth in the accompanying certification, incorporated by reference herein, purchased Wayfair securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

14. Defendant Wayfair is a Delaware corporation with its principal executive offices situated at 4 Copley Place, 7th Floor, Boston, MA. It also maintains an office at 155 Sixth Ave, 7th Floor, New York, NY 10013. Wayfair is purportedly one of the largest online retailers of home goods. Wayfair Class A common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "W."

15. Defendant Niraj Shah ("Shah") has served as the Company's Chief Executive Officer and Director at all relevant times. Shah is also a Co-Founder and Co-Chairman of Wayfair.

16. Defendant Michael Fleisher ("Fleisher") has served as the Company's Chief Financial Officer at all relevant times.

17. Defendants Shah and Fleisher are referred to herein as the "Individual Defendants."

18. Wayfair and the Individual Defendants are collectively referred to herein as the "Defendants."

19. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

20. Wayfair is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wayfair under *respondeat superior* and agency principles.

## RELEVANT NON-PARTY

22. Overstock is a Delaware corporation with its principal executive offices situated at 6350 South 3000 East Salt Lake City, Utah 84121. Overstock was founded in 1999 and its common stock began trading on NASDAQ under the symbol "OSTK" on May 30, 2002. Overstock operates as an online retailer primarily in the United States.

23. Overstock offers furniture, home décor, bedding, housewares, jewelry, apparel, electronics, and a variety of other products for sale online.

24. Overstock uses multiple websites to sell its merchandise including www.overstock.com, www.o.co, and www.o.biz. Likewise, Wayfair operates different websites including www.wayfair.com, www.jossandmain.com, www.allmodern.com, www.birchlane.com, www.dwellstudio.com, and www.wayfairsupply.com to sell its merchandise.

25. Overstock operates niche websites for different aesthetics and consumer's tastes like Worldstock Fair Trade, a marketplace for artisans to sell their work, and Main Street Revolution, a marketplace for small and minority-owned business owners to sell their products. Likewise, Wayfair operates different websites to target different aesthetics and consumer's tastes such as AllModern for who prefer modern décor.

26. According to its Form 10-K for the year ending December 31, 2014 filed with the SEC on March 12, 2015, Overstock fulfills approximately 10% of its orders directly to consumers from its warehouse. Overstock's predominate method of selling merchandise, accounting for about 90% of its sales, is through other retailers or fulfillment partners. Overstock acts as a platform for suppliers to reach customers. The fulfillment partners are responsible for the inventory and shipping of the products while Overstock provides the resources and platform to handle customer service inquiries and returns. This "inventory light" business practice substantially similar to Wayfair's model.

27. A successful aspect of Overstock's business is its flash sales through its websites. In a flash sale, a limited supply of a product is sold for a short period of time such as a day or a

week. Seeing the success of Overstock's flash sales, in 2011 Wayfair launched Joss & Main, its own site dedicated to flash sales.

28. In 2009, Overstock launched www.o.biz, a site targeting businesses. As Overstock describes it, www.o.biz is for businesses including restaurants, hotels, offices or retail stores to buy business-related items. In 2012, Wayfair launched www.wayfairsupply.com which is also a website specifically for businesses including the same industries www.o.biz targets such as restaurants, hotels, offices, and retail stores.

29. The similarities between the companies continue with the fact that Wayfair has two facilities – a warehouse, distribution, and customer service center as well as another customer service center – in Utah. Both locations, Odgen, Utah which opened in 2012 and Orem, Utah which opened in 2014, are geographically very close to Overstock's headquarters and operations in Salt Lake City, Utah where Overstock has been operating since its inception in the late 1990s.

## SUBSTANTIVE ALLEGATIONS

### Background

30. Wayfair was co-founded by Defendant Shah as private company in May of 2002. From 2002 through 2011 Wayfair operated over 240 niche websites selling different types of home goods and furniture. In late 2011, the Company changed its strategic focus and redirected and closed all their websites to a single site, www.wayfair.com, to create single online one-stop shop for furniture, home furnishings, décor and goods.

31. In building its supplier networks, upon information and belief, Wayfair specifically targeted Overstock's suppliers and vendors. During major furniture trade shows in North Carolina and elsewhere, Wayfair sent dozens of personnel asking suppliers to provide the "same deal" they had with Overstock.

32. Thus, by asking furniture suppliers to provide Wayfair the "same deal" as Overstock, Wayfair was attempting to replicate Overstock's business.

33. Like Overstock, Wayfair offers a vast variety of products from its websites while at the same time, the Company's business model is to hold minimal inventory and to ship items directly from its suppliers to the Company's customer. This supplier direct fulfillment network is core to Wayfair's business operations.

34. To attract customers to it site, Wayfair relies on TV advertising, display advertising, and paid search advertising. Wayfair spends a significant amount on sale and marketing expenses. As reported in Wayfair's Prospectus filed with SEC on October 2, 2014, in connection with its IPO, Wayfair spent $106 million, $113 million, and $177 million for sales and marketing for years ended 2011, 2012, and 2013, respectively.

35. Likewise, according to Overstock's 10-K filed with the SEC on March 12, 2015, Overstock spent $63.4 million and $91.6 million in sales marketing for years ended 2012 and 2013, respectively.

36. As Wayfair scaled its business it lost significant sums of money, including $21 million and $15.5 million in net losses for 2012 and 2013, respectively. Leading up to its IPO Wayfair has over $277.1 million in accumulated losses.

37. Unlike Wayfair, however, Overstock is actually profitable. Overstock reported net income of $14.7 million and $84.4 million for 2012 and 2013, respectively.

38. In order to maximize its valuation and attractiveness to investors, Wayfair touted itself as a technology Company in its Registration Statement. For example, Wayfair's Registration Statement states:

a. This supplier direct fulfillment network is a key component of our custom-built and seamlessly integrated technology and operational platform, which also

includes extensive supplier integrations, a proprietary transportation delivery network and superior customer service.

b. Our co-founders are lifetime tech innovators who have worked together in the consumer internet sector since 1995 and have created a company culture deeply rooted in technology. Our technology and data focus facilitates critical e-commerce capabilities such as tailored shopping experiences across our five brands, consumer targeting and personalization, and "anytime, anywhere" shopping across our websites, mobile-optimized websites and mobile applications, which we collectively refer to as our sites.

c. Through our technology platform, we offer our suppliers a cost-effective channel, the ability to leverage our technological expertise, a real-time view of our demand and proven logistics capabilities to help sell their products.

d. ***Personalized and Mobile Shopping Experiences:*** Our purpose-built technology platform, which is fully integrated across all of our sites, including our mobile applications, is designed to provide consumers with a compelling user experience as they browse, discover and purchase our products. We use personalization, based on past browsing and shopping patterns and personal preferences, as well as inspirational imagery, to create a more engaging consumer experience. Our investment in mobile allows us to deliver value, convenience and inspiration to our customers who are browsing and shopping anytime and anywhere, often during spare minutes throughout the day. Our custom-built platform is designed to provide us with detailed and real-time insight into our suppliers' inventory in order to ensure our customers are browsing current information and rarely experience stock-outs.

e. ***Ability to Leverage Our Technological Expertise to Drive Sales:*** Our technology platform is designed to allow suppliers to easily provide us with their full product selection. Through our technology platform, we believe many of our suppliers have increased their sales, which has strengthened their loyalty to us.

f. ***Increase Repeat Purchasing through Merchandising, Data, Analytics and Technology:*** Our continued investments in merchandising, data, analytics and technology allow us to deliver increasingly tailored and personalized shopping experiences for consumers across our sites.

g. ***Continue to Invest in Our Technology and Operational Platform, Including Our Mobile Platform:*** We intend to continue to enhance the systems our consumers use to interact with our sites in order to facilitate better product discovery and to provide customer inspiration and idea generation tools through personalized interactions and high-speed, reliable site performance. We also plan to continue investing in our infrastructure, including enhancing our merchandising, data, analytics and technology platform, as well as developing additional logistics and transportation solutions, self-service tools for our

suppliers, fulfillment offerings and enhancing our development, testing and deployment systems. Finally, we plan to continue to launch additional mobile capabilities. Following the successful launch of our Joss & Main mobile application in 2012, in 2014 we launched the Wayfair.com mobile application and mobile-optimized sites across a majority of our domestic and international sites.

h. In addition, stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many technology companies, including e-commerce companies. Stock prices of many technology companies, including e-commerce companies, have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. In the past, stockholders have instituted securities class action litigation following periods of market volatility.

39. The Registration Statement was materially misleading because while it listed "Online Home Goods Retailers and Marketplaces" that competed with the Company such as Amazon and eBay, as Wayfair failed to disclose its prime competitor Overstock. The Registration Statement was signed by the Individual Defendants. The Registration Statement states in relevant part:

> **Our business is highly competitive. Competition presents an ongoing threat to the success of our business.**
>
> Our business is rapidly evolving and intensely competitive, and we have many competitors in different industries. Our competition includes: furniture stores, big box retailers, department stores, specialty retailers, and online home goods retailers and marketplaces, including:
>
> - Furniture Stores: Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan and Rooms To Go;
> - Big Box Retailers: Bed, Bath & Beyond, Home Depot, IKEA, Lowe's, Target and Walmart;
> - Department Stores: JCPenney and Macy's;
> - Specialty Retailers: Crate and Barrel, Ethan Allen, HomeGoods, Pottery Barn and Restoration Hardware; and
> - ***Online Home Goods Retailers and Online Marketplaces: Amazon, eBay and One Kings Lane.***
>
> We expect competition in e-commerce generally to continue to increase. We believe that our ability to compete successfully depends upon many factors both within and beyond our control, including:

- the size and composition of our customer base;
- the number of suppliers and products we feature on our sites;
- our selling and marketing efforts;
- the quality, price and reliability of products offered either by us;
- the convenience of the shopping experience that we provide;
- our ability to distribute our products and manage our operations; and
- our reputation and brand strength.

Many of our current competitors have, and potential competitors may have, longer operating histories, greater brand recognition, larger fulfillment infrastructures, greater technical capabilities, faster and less costly shipping, significantly greater financial, marketing and other resources and larger customer bases than we do. These factors may allow our competitors to derive greater net revenue and profits from their existing customer base, acquire customers at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer habits. These competitors may engage in more extensive research and development efforts, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger customer bases or generate net revenue from their customer bases more effectively than we do.

(emphasis added).

40. Wayfair was motivated to omit Overstock as a competitor because had the market valued Wayfair's shares like Overstock's, Wayfair would have had a much lower valuation. In fact, the table below demonstrates the lower valuation the market had on Overstock compared to publically traded companies Wayfair listed in its SEC filings, including Amazon and eBay:

| **Company** | **Market Cap** (As of each company's own FY 2014)* | **Revenue** (As of each company's own FY 2014)* | **Price to Sales** Ratio (Market Cap/Revenue) | **Enterprise Value** (As of each company's own FY 2014)* |
|---|---|---|---|---|
| Wayfair | $1,651,200,000 | $1,319,000,000 | 1.25 | $1,235,300,000 |
| Amazon | $144,312,800,000 | $88,988,000,000 | 1.62 | $142,985,800,000 |
| eBay | $68,690,900,000 | $17,902,000,000 | 3.84 | $66,219,900,000 |
| Overstock | $583,400,000 | $1,497,100,000 | 0.39 | $401,700,000 |
| Havertys | $498,500,000 | $768,400,000 | 0.65 | $474,800,000 |
| Bed, Bath & Beyond | $13,930,600,000 | $11,504,000,000 | 1.21 | $13,074,700,000 |
| Home Depot | $106,053,000,000 | $78,812,000,000 | 1.35 | $118,848,000,000 |

| | | | | |
|---|---|---|---|---|
| Lowe's | $47,678,900,000 | $53,417,000,000 | 0.89 | $57,623,700,000 |
| Target | $35,849,200,000 | $71,279,000,000 | 0.50 | $48,936,200,000 |
| Walmart | $241,154,800,000 | $476,294,000,000 | 0.51 | $295,598,800,000 |
| JCPenney | $1,803,200,000 | $11,859,000,000 | 0.15 | $5,827,200,000 |
| Macy's | $19,412,700,000 | $27,931,000,000 | 0.70 | $24,330,700,000 |
| Ethan Allen | $715,700,000 | $746,700,000 | 0.96 | $719,500,000 |
| Restoration Hardware | $2,219,900,000 | $1,551,000,000 | 1.43 | $2,293,800,000 |

*Data complied from Bloomberg

41. Had Wayfair been valued like Overstock, at the time of the IPO, Wayfair would have been priced less than one-half of the $29/share price in the IPO.

42. Wayfair’s valuation for most of the Class Period was well above a price to sales ratio of 2.

43. Wayfair’s gambit paid off. On October 2, 2014, Wayfair began trading on the NYSE following its IPO of 11 million shares at $29.00 per share, which raised $319 million.

44. Defendants similarly failed to disclose Overstock as a competitor throughout the Class Period which rendered the following periodic reports filed with the SEC materially misleading:

a. Form 10-Q for the quarter ended September 30, 2014 filed with the SEC on November 14, 2014, signed by the Individual Defendants,

b. Form 10-K for the fiscal year ended December 31, 2014 filed with the SEC on March 19, 2015, signed by the Individual Defendants;

c. Form 10-Q for the quarter ended March 31, 2015 filed with the SEC on May 14, 2015, signed by the Individual Defendants; and

d. Form 10-Q for the quarter ended August 12, 2015 filed with the SEC on August 12, 2015, signed by the Individual Defendants.

45. The above periodic reports filed with the SEC were each accompanied by Sarbanes Oxley Act of 2002 certifications executed by the Individual Defendants that falsely attested that the corresponding 10-Q or 10-K was accurate. The corresponding 10-Q or 10-K was materially misleading because it failed to disclose Overstock as a competitor.

**The Truth Emerges, Causing Investor Losses**

46. On August 31, 2015, analyst firm Citron Research published a report on Wayfair asserting, among other things, that Wayfair failed to mention Overstock as a competitor in its SEC filings despite the similarities between the companies (the "Citron Research Report").

47. The Citron Research Report states in part:

**It's Overstock!!**

First we would like to stress the obvious, which everyone except the company and the analysts will admit. ***Wayfair is Overstock, plain and simple. The only difference is that Overstock has better brand recognition and higher traffic. 74% of all Overstock sales are furniture and home goods.*** Here is a quick comparison of the two companies:

| | Wayfair | Overstock |
|---|---|---|
| Home and Garden | 95% | 75% |
| Drop Ship Product Transaction | 95% | 90% |
| Revenues, last 6 months | 916,123,000 | 786,357,000 |
| Net gain (loss) | (46,470,000) | 4,407,000 |
| Price / Sales (ttm) | 2.18 | .32 |
| Website Rank | **160th in the US** | **138th in the US** |
| Enterprise Value | **3,390,000,000** | **402,690,000** |

What is more amazing is that in Wayfair's analyst report from Evercore we see a consumer survey showing that in the past 12 months **more people shopped for home goods on Overstock than Wayfair.**

Exhibit 60

**Mind Share of Retailers Online and In-Store**

*On which of the following websites/ stores have you shopped for home furniture/ goods during the last 12 months? Please select all that apply.*

| | Home Goods | | Home Furnishing | |
|---|---|---|---|---|
| | Online | Store | Online | Store |
| Amazon | 58% | -- | 35% | -- |
| Walmart | 41% | 61% | 29% | 37% |
| Target | 34% | 51% | 22% | 31% |
| Department Stores | 31% | 44% | 19% | 26% |
| Bed, Bath & Beyond | 28% | 42% | 14% | 20% |
| Overstock | 18% | -- | 13% | -- |
| Wayfair | 10% | -- | 9% | -- |
| Pier 1 | 7% | 10% | 6% | 9% |
| Pottery Barn | 7% | 8% | 6% | 6% |
| Williams-Sonoma | 6% | 7% | 3% | 4% |

*Source: Evercore ISI Research*

With only slightly more top line revenue, Wayfair is running 5x the amount of commercials as Overstock. Notice even the advertising agencies make the apples to apples comparison.

| | Number of Spots | National Airings | Airing Rank | Spend Rank |
|---|---|---|---|---|
| Wayfair | 29 | **2,806** | 236 | 297 |
| Overstock | 85 | 506 | 981 | 747 |

http://www.ispot.tv/brands/Id3/wayfair and http://www.ispot.tv/brands/d32/overstock-com

Both companies even have the same corporate strategies.

**This month Overstock partners with HGTV:**
http://www.furnituretoday.com/article/522546-overstock-partners-hgtv-urban-oasis-home

**And a few months ago Wayfair partners with HGTV:**
http://www.homeaccentstoday.com/article/519317-wayfair-partners-hgtv-fixer-upper-stars

**For those who are not convinced this is the same business as Overstock: take this.**

**While never PR'd by Wayfair, local news stories have confirmed that as of this month Wayfair has committed to open a 1 million Sq Ft. warehouse facility in Cincinnati. (so much for the "asset light" model)**

> http://www.cincinnati.com/story/money/2015/08/26/wayfair-distribution-center/32398239/
>
> This happens to be two miles away from the Overstock warehouse in Cincinnati. https://www.internetretailer.com/2013/03/07/overstock-looks-east-new-warehouse-near-cincinnati
>
> **And BOTH companies also operate Warehouse shipping Distribution Centers in Utah.**
>
> **So how does studying Overstock help us understand where Wayfair will trade in 12 months?**
>
> (OSTK) was spending a similar portion of its gross revenues on marketing until 2006-2007, when it reduced this unsustainable spend rate to around 10% of sales. What happened? Revenue growth fell from 63% per year in 2005 to -3% in 2007 and never really recovered….Nothing more to be said. https://www.newconstructs.com/danger-zone-wayfair/
>
> ***Wayfair actually intentionally shuns the comparison (incredibly, they refuse to mention Overstock as a competitor in their SEC filings.)*** The ONLY conceivable rationale for this omission is if they acknowledge Overstock as a comp, it becomes apparent to all that Wayfair's stock is not worth more than $10 a share.
>
> (Emphasis added).

48. As a result of this news, shares of Wayfair fell $4.92 per share or over 11% to close at $37.30 per share on August 31, 2015, damaging investors.

## ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER

49. In addition to the $319 million raised by Wayfair in its IPO at an artificially inflated price, insiders also exploited Wayfair's inflated stock prices. Insiders reaped nearly $41 million in stock sales during the Class Period at artificially inflated prices. The table below sets forth the stock sales of certain Wayfair officers and directors during the Class Period:

| Name and Position at Wayfair | Number of Shares Sold During the Class Period | Proceeds |
|---|---|---|
| **Niraj Shah**<br>CEO, Co-Founder, Co-Chairman | 263,612 | $9,123,226.82 |
| **Michael Fleisher** | 30,000 | $1,103,975.00 |

| | | |
|---|---|---|
| CFO | | |
| **Steven Conine**<br>Co-Founder and Co-Chairman | 264,013 | $9,139,492.08 |
| **James Savarese**<br>COO | 74,000 | $2,718,395.00 |
| **Steve Oblak**<br>SVP and GM, Wayfair.com | 5,450 | $193,835.20 |
| **John Mulliken**<br>SVP, Strategic Initiatives | 31,198 | $1,256,026.32 |
| **Nicholas Malone**<br>Chief Administrator Officer | 51,250 | $1,789,750.00 |
| **Edmond Marci**<br>SVP, Marketing and Analystics | 10,500 | $369,230.00 |
| **Neeraj Agrawal**<br>Director, 10% owner | 552,233 | $15,053,871.58 |
| **Total** | **1,282,256** | **$40,747,802.00** |

## CLASS ACTION ALLEGATIONS

50. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Wayfair securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wayfair securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Wayfair shares were traded publicly during the Class Period on the NYSE. As of September 30, 2015, there were 44,505,054 shares

of Wayfair Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Wayfair or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

53. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

54. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Wayfair;

(c) Whether the price of Wayfair shares was artificially inflated during the Class Period; and

(d) To what extent the members of the Class have sustained damages, and the proper measure of damages.

55. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

56. The market for Wayfair securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Wayfair securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Wayfair securities and the market information relating to Wayfair, and have been damaged thereby.

57. During the Class Period, the artificial inflation of Wayfair stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Wayfair's business, operations and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Wayfair and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58. At all relevant times, the market for Wayfair securities was an efficient market for the following reasons, among others:

(a) Wayfair securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Wayfair filed periodic public reports with the SEC and/on the NYSE;

(c) Wayfair regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

(d) Wayfair was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59. As a result of the foregoing, the market for Wayfair securities promptly digested current information regarding Wayfair from all publicly available sources and reflected such information in Wayfair's stock price. Under these circumstances, all purchasers of Wayfair securities during the Class Period suffered similar injury through their purchase of Wayfair securities at artificially inflated prices, and a presumption of reliance applies.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**AFFILIATED UTE**

60. Neither Plaintiffs nor the Class need prove reliance either individually or as a class because under the circumstances of this case, which involves a failure to disclose

Overstock as a competitor to the Company described herein above, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

61. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

62. During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Wayfair securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants, and each of them, took the actions set forth herein.

63. The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Wayfair securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64. The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Wayfair's business, operations and financial performance and prospects, as specified herein.

65. The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wayfair' value and performance and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Wayfair and its business operations and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Wayfair' financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Individual Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge

by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Wayfair securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants, but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Wayfair securities during the Class Period at artificially high prices and were damaged thereby.

67. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Wayfair and its business and prospects, which were not disclosed by Individual Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Wayfair securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

70. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71. The Individual Defendants acted as controlling persons of Wayfair within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73. As set forth above, Wayfair and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as class counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: January 11, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Phillip Kim

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this on the 11th day of January, 2016, a true and correct copy of the foregoing FIRST AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Phillip Kim